Green, Judge,
delivered the opinion of the court:
On October 13, 1932, the plaintiff entered into a contract with the United States whereby, for a consideration of $52,150, plaintiff agreed to furnish all labor and materials and perform all work required for the construction of a Post Office at Bingham Canyon, Utah, in accordance with the specifications, schedules and drawings made a part of the contract. The contract provided that the work should be commenced as soon as practicable after the date of receipt of notice to proceed, and should be completed within 360 calendar days after the receipt of such notice.
On November 11, 1932, plaintiff received notice to proceed with the work. The date for completion was subsequently extended until December 5, 1933 became the date for completion.
The contract provided that the work should be performed under the supervision of the defendant’s construction engineer, who arrived at the location the latter part of November 1932, and at which time the work was commenced. The building was substantially completed in December 1933 and turned over to the Government on December 20, 1933. From and after January 1, 1934, the building was occupied by the defendant and no more work was performed' by the plaintiff.
The plaintiff seeks to recover on four items of alleged damages. The first of these items is the increased costs of excavating material of a rock-like nature. This excavating was done for the placing of foundations and for that purpose a power shovel was placed on the premises. Paragraph 66 of the specifications attached to the contract specified the extent of the excavations. Paragraphs 67 and 68 of the specifications read as follows:
67. The basis of bidding shall be that all other material to be removed is earth. Material. which it is practicable to remove and handle with pick and shovel or by hand or to loosen and remove with a power shovel shall be classed as earth.
68. If excavation of other materials becomes necessary the additional expense will be determined by the contracting officer.
*584 The findings sKow that excavation was done in tbe winter when the ground was frozen, the freezing extending downward to approximately three feet below the surface. They further show that 2,480 cubic yards consisted of boulders, dirt, natural debris, timbers, and junk, dumped there in the process of back-filling voids left in gold-mining operations or in the abandonment of old flumes. This heterogeneous material was frozen together and could not be removed without blasting.
The plaintiff wrote a letter to the Supervising Architect, January 23, 1933, describing the situation, quite particularly as shown in Finding 6, and asking an increase in the contract-price for this excavation. Several communications passed between the Supervising Architect and the plaintiff. The Supervising Architect finally notified the plaintiff that a report of the construction engineer did not bear out the contention that solid rock was encountered or that any of the material could not be loosened without a pick or power shovel, and this decision was affirmed on appeal to the Secretary of the Treasury.
The defendant relies largely on Article 15 of the contract which reads as follows:
Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision, shall be final and conclusive upon the parties thereto as to such questions of fact. In the meantime the contractor shall diligently proceed with the work as ' directed.
The defendant also says that the plaintiff was slow in commencing the work and in its prosecution, but that the ground was frozen about December 1st and remained so frozen to an approximate depth of three feet until the following first of April. The delay on the part of the defendant in sending its construction engineer to the work prevented any substantial amount of the work being done until after the first of December, when the ground was frozen. Even if the work had not been delayed it would not have been practicable to *585 remove with pick and shovel, or power shovel, the material encountered as above described.
The defendant contends that the character of the material to be removed is a question of fact and that the decision of the contracting officer thereon, subject to appeal, was final. If this was a matter as to which there was some doubt' this would be true, but it is clear that when the definition of “earth”, set out in specification 67, is considered, the holding of the contracting officer with reference to the material which plaintiff encountered is grossly erroneous and shows such bias and prejudice as to be purely arbitrary and to imply bad faith. We are therefore justified in disregarding his decision under the repeated holdings of this court. It would not be “practicable” to remove such material in the manner described in the specifications even if the ground had not been frozen, and the evidence shows that it was not the fault of plaintiff that the work had not been commenced earlier and finished before freezing weather set in.
The contract provided that the defendant might make changes in the work required, but as was said in Rust Engineering Co. v. United States, 86 C. Cls. 461 (a case in which the facts were quite similar and exactly the same provisions were in the contract), this does not prevent recovery for changes based upon conditions which are unknown and materially different from anything contemplated by the parties when the contract was executed. See also Maurice H. Sobel v. United States, 88 C. Cls. 149, and Stapleton Construction Co. v. United States, No. 48527, decided December 2,1940.
We think it is satisfactorily shown that the plaintiff has a just claim for the excavation of material which could not be classed as “earth” under Specification 67. The testimony as to the additional cost of removing this material consists of cost sheets of plaintiff which were introduced in connection with oral testimony as to the nature of the material, and plaintiff’s president testified that the amount which was claimed was the actual additional cost over the cost of removing earth. Moreover, in the extensive correspondence had between the parties the defendant made no defense based upon the value of the work. The claim was denied solely on the ground that the material was not of the nature *586 claimed by plaintiff, which, as we have said above, is grossly erroneous and directly contrary to the uncontroverted evidence. We find that the plaintiff is entitled to recover additional compensation for 2,430 cubic yards at $1.25 per yard, or $8,037.50.
Plaintiff also claims damages by reason of the alleged delay by defendant in reaching a decision on the footings and foundation changes, also for the additional work in relation thereto.
With relation to the additional work we find that in February 1933 the plaintiff advised the Supervising Architect that “a very unsatisfactory soil condition had been encountered” in making the excavations for the foundations and suggested that “a survey be made and all footings be redesigned.” The defendant made the survey requested and found the situation to be as described. The defendant’s superintendent then directed the contractor to stop work on account of unsatisfactory footings and soil conditions, causing a delay to the building of 28 days, and a total of 80 days pending a decision by the defendant as to what changes should be made in the footings. The construction engineer devised plans for the changes in the footings and March 4, 1933, the plaintiff offered to revise the footings in accord with the new design for the sum of $1,064, with 20 days’ extension of contract time for the additional work made necessary. March 15,1933, the Assistant Secretary of the Treasury sent plaintiff a telegram to the effect that it was ordered to “proceed with the work on the footings * * * at cost plus ten percent overhead ten percent profit, total not exceeding figure named by you, with twenty additional days all subject consent surety * *
The plaintiff completed the footings as modified and reported to the construction engineer a daily record of the labor cost. On April 24, 1933, the plaintiff reported this cost to the Supervising Architect as $1,225.62, and adding thereto' 10 percent for overhead, and 10 percent on the aggregate for profit, made a total of $1,482.99 which the plaintiff asked to be allowed. The Assistant Secretary of the Treasury disallowed this claim on the ground that the work had been ordered at an upset price of $1,064, the figure named by plain *587 tiff in the proposal of March 4. The plaintiff argues that the bid on the new design was not accepted in the form it was presented and that there was therefore no contract to perform the additional work for $1,064. The plaintiff, was paid $1,064 but claims to be entitled to receive the difference between that sum and $1,482.99 shown above.
We think this claim must he denied. When the defendant advised plaintiff of the amount which it would pay for the work, and the plaintiff went ahead with it without making protest or notifying defendant that it would not be bound by the price at which the latter stated was to be paid, we are inclined to.think it is precluded from asking to be paid more than the defendant proposed. In any event when the plaintiff on March 22, 1933 delivered to the defendant a “Stipulation and Consent” in writing, executed by the plaintiff and its surety, which stated that the total amount to be paid for additional work on the footings, in accordance with the new design, was “not to exceed the sum of $1,064.00,” the agreement was perfected, and the plaintiff’s claim for $418.99 as additional contract compensation on account of the footings must therefore be rejected.
Plaintiff also claims damages by reason of the delay of the defendant in reaching a decision on the footings and foundation changes, and additional work incident thereto. That delay did result while the defendant was reaching a decision in this matter is clear, and we think it is also plain that the plaintiff was compelled to keep its organization intact and ready to proceed during this period. In ¡listing its daily expense for the purpose of computing the overhead the plaintiff makes a charge, of $1.67 for insurance on the property being constructed, and $1.50 for interest on capital invested. Neither of these items, we think, should be allowed. Not including these two items we find the reasonable amount of plaintiff’s daily overhead to be $16.83.
The system adopted by the defendant for the construction work necessarily caused other delay. A firm by the name of Scott & Welch was employed to draw the plans and specifications. The architectural materials, such as millwork, painting, stone, exterior stone, and matters of *588 that nature had to be approved by the architects, and after having been approved by them were still required to be approved by the supervising architect of the defendant. A matter of this kind should have been attended to before the contract was let, or at least in time for the work to proceed. As the contract specified the time for its com? pletion there was an implied contract between the parties when plaintiff was directed to proceed with the work that all necessary construction details would be ready and furnished to plaintiff when required, but instead the evidence shows it took nearly four months for plaintiff to get the millwork detail drawings prepared by the architects so that it could be ordered from the millwork firm. Further difficulty was encountered due to the fact that the defendant refused to accept the details that the architects had made and they had to be returned and done over again. About the middle • of October 1933 the plaintiff was still being delayed by the failure of defendant’s architects Scott & Welch to act on samples of paint submitted as early as May 1933. But the evidence as to how much these matters affected the completion of the building is very indefinite and uncertain. These delays probably overlapped more or less the period used in the general construction of the building but how much it is impossible to tell from the evidence. There is no direct evidence showing at what time the building would have been completed had these delays not occurred. On the other hand it appears that the defendant’s engineer stopped the pouring of concrete in the retaining walls from January 7 to January 18, 1933, and also stopped work on February 15 for 28 days on account of unsatisfactory footings and soil conditions. Although there is no way of determining exactly how much time was caused to be lost by defendant in coming to a decision on the matter of changes in the footings and struts, and the lack of prompt decisions by the architects, and some other matters, we think there should be included on account of all these matters a figure which represents, under all the evidence, the amount of delay caused by the defendant which we can conclude is reasonably certain — that is, that the plaintiff suffered at least that amount of delay.
*589 The plaintiff relies largely on Communications addressed to the defendant’s officers, and claims presented therein which were denied by the defendant, and are not evidence of the correctness of the claims so made.
Our conclusion upon all the evidence and ultimate finding upon the matter of delays is that plaintiff lost at least 60 days by the fault of the defendant, that is that it took at least 60 days longer in the completion of the building, and that plaintiff is entitled to recover for this delay the sum of $1,009.80, for overhead at the rate of $16.83 per day.
The plaintiff also claims damages due to defendant’s alleged breach of contract and delay in furnishing models for the lamp standards and in making final payment for the work.
The defendant failed to furnish the models for the lamp standards in time and until the models were furnished the plaintiff could not have the standards made and set up. But the work required in setting up the standards was very slight. The evidence is so indefinite and uncertain as to the amount of extra expense, if any, caused to plaintiff by reason of the delay in relation to the models for the lamp standards that this claim cannot be allowed. Part of this delay was caused in the first instance by the plaintiff making claim that it was not required to furnish the lamp standards — a claim which it afterwards withdrew.
Plaintiff claims damages by reason of the delay of the Government in making final payment. The contract provides that upon completion and acceptance of all work required the amount due the contractor will be paid after the contractor shall have furnished the Government with a certain kind of release of claims against the Government. The matter of this release may not be important but the contract did not require payment until “all work” was accepted and this did not take place until the lamp standards were installed and accepted as satisfactory, which was on June 29, 1934. Final settlement was not made until September 22, 1934, but in view of the dispute between the plaintiff and the Government’s officials we cannot say that an unreasonable delay took place in making the final payment.
*590 It follows from what has been stated above that the plaintiff is entitled to recover $3,031.50 on account of the increased amount of work required on the excavation, and $1,009.80 on account of unreasonable delays, or a total of $4,047.30 for which judgment will be entered. It is so ordered.
Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.